UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN NEBLETT,

    Petitioner,

    v.

S. W. ORNOSKI, warden,

    Respondent.

                                    /

No. C 05-4228 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

John Neblett, an inmate at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Neblett was convicted in San Diego County Superior Court of second degree murder and was sentenced in 1985 to 15 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a March 26, 2003 decision of the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. The 2003 hearing was Neblett's fifth parole hearing, and was conducted at a time when he was 18 years into his 15-to-life sentence.

The BPH identified the circumstances of the commitment offense, Neblett's unstable social history, his prior criminality, and his need for further therapy as the reasons for the determination that Neblett was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Resp. Exh. 2 (reporter's

transcript of March 26, 2003 BPH hearing (hereinafter "RT")) at 58-59. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Neblett sought relief in the California courts. Neblett filed a habeas petition in 2004 in the Marin County Superior Court that was transferred to the San Diego County Superior Court, where it was denied in a reasoned decision. Resp. Exhs. 25-26. The California Court of Appeal denied Neblett's habeas petition in a reasoned decision. Resp. Exhs. 27-28. The California Supreme Court summarily denied Neblett's habeas petition. Resp. Exhs. 29-30.

Neblett then filed his federal petition for a writ of habeas corpus. The court found cognizable three claims -- i.e., that there was not sufficient evidence to support the decision, that the decision breached the plea agreement he entered when he pled guilty, and that the regulation the BPH uses to determine parole suitability is void for vagueness – and ordered respondent to show cause why the writ should not issue. Respondent filed an answer and Neblett filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at San Quentin State Prison in Marin County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.  Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008); Sass, 461 F.3d at 1127-28; Cal. Penal Code § 3041(b); see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill,

472 U.S. at 455-56.) The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).[1] The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context. In addition to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior. Our system of federalism encourages this state experimentation." Id.; see also id. at 8.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. See Hayward, 512 F.3d at 542. One must look to state law to answer the question, "'some evidence' of what?"

B.  State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first

---

[1] Although Sass saw the requirement that the decision not be "otherwise arbitrary" as part of the "some evidence" standard, 461 F.3d at 1129, Hayward saw the "some evidence" requirement as separate from the requirement that the decision not be "otherwise arbitrary." Hayward quoted Irons, infra, for the proposition: "We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."'" Hayward, 512 F.3d at 542.

4

degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 546 U.S. 844 (2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[2] The regulation also

---

[2] The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The federal habeas court's task is not to determine whether some evidence supports the reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety." Hayward, 512 F.3d at 543 (citation omitted).

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction. Four Ninth Circuit cases provide guidance for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, Irons v. Carey, 505 F.3d 846 (2007), and, most recently, Hayward, 512 F.3d 536. Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper speculation and beyond the scope of the dispute before the court. Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in

6

determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). The next decision, Irons, aligned with Biggs, determining that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence, but emphasized that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853. Most recently, Hayward granted relief to a prisoner who had been in custody 27 years on his 15-to-life sentence. Hayward repeated the quoted passage from Biggs and stated Irons had noted that "'in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.' Irons, 505 F.3d at 854. 'The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.' [In re] Scott, 133 Cal.App.4th [573, 595 (Cal. Ct. App. 2005)]." Hayward, 512 F.3d at 545.[3]

The message of these cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as

---

[3] The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense"). Hayward does not explain how Dannenberg's more-than-the-minimum-elements rule fits into the picture, and simply ignores it.

the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u>, <u>Irons</u>, and <u>Hayward</u>). Also, the focus must be on whether the commitment offense demonstrates present dangerousness if it is relied upon to deny parole (<u>Hayward</u>).  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

C.  <u>The Claims</u>

    1.  <u>Some Evidence Supports The BPH's Decision In Neblett's Case</u>

The BPH identified the circumstances of the commitment offense, Neblett's unstable social history, Neblett's prior criminality, and his need for further therapy as the reasons for the determination that Neblett was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

The crime was summarized in the probation officer's report, which was incorporated by reference at the 2003 hearing:

> On 7-14-84 at 1635 hours, police responded to a shooting that had occurred in a motor home parked on Fiesta Island. The motor home belonged to William Mohrman. According to witnesses, one gunshot was fired within the motor home, followed by a white male with blood on his hand, later identified as John Neblett, stating "I shot him[.]" The victim was 22-year old Robert Anthony Gortarez.
>
> Earlier that day, Neblett and a friend picked up a quarter-keg of beer and drove to Fiesta Island for the 'over-the-line' tournament. They began to socialize with Mohrman (a co-worker of Neblett's) and various other people, at Mohrman's motor home. Mohrman took out his gun to show nearby friends. He returned a short time later, unloaded the gun and left it on the sofa in the motor home. The shells were placed next to the gun. DaVilla, Neblett's friend, put the gun and shells in a rear cabinet. Mohrman and Neblett left to get some ice for the beer. During the time they were gone, DaVilla and the others were joined outside by Gortarez. Gortarez was in and out of the motor home on several occasions, drinking beer and asking for cigarettes. Upon his return with ice, Neblett gave Gortarez another beer and cigarette, then told him to leave. Gortarez complied but returned a short time later asking for more. Neblett became agitated with Gortarez's obnoxiousness and unwillingness to leave. Neblett retrieved the gun from the rear of the motor home and placed it to Gortarez's head while he was seated on the step outside the motor home. Neblett stated, "We told you to get the hell out of here. I'm not fucking with you." Gortarez told him to take it easy. Neblett fired the gun in an upward angle below Gortarez's ear, resulting in the victim's death. Neblett then moved the body to the back of the motor home and told somebody to call the cops because he had killed a man.

Resp. Exh. 9 at 1, Exh. 10 at 2-3; RT 6. When prodded, Neblett admitted that he had been

motivated in part by bigotry: "The skin tone of my victim influenced me slightly." RT 55; but cf. RT 37-38 (doesn't remember making "the remark that he killed the victim because the victim was a Mexican.") Neblett also stated that, on the day of the shooting, he had a "hallucination thinking that [the victim] had come back to harm [him]." RT 7. Neblett obtained the gun to defend himself and once he had the gun, his temper "went through the ceiling" and he felt powerful. RT 7, 39. Neblett wrestled with feelings of inadequacy, as he thought he "was a sissy and [he] wouldn't do anything because [he] was so afraid," RT 7, and then shot the victim. Neblett pulled the trigger with the intent to kill.

The BPH next considered Neblett's pre-incarceration factors. RT 12; Resp. Exhs. 11-13. Neblett came from a dysfunctional family, his parents abused alcohol, and Neblett had developed a serious alcohol problem. Neblett stated that he had consumed a lot of alcohol on the day of the murder. He also explained that, since his juvenile years, he had been drinking until he passed out. He also had two juvenile arrests involving alcohol, for which he was fined. His parents also had abused alcohol, fought regularly, showed minimal affection for the children, and divorced when he was 14. Resp. Exh. 12. Neblett smoked some marijuana, but when he dropped out of school and joined the Navy, he switched to alcohol consumption that progressively worsened. The BPH considered Neblett's favorable behavioral history in custody. Neblett had received a rules violation report in 1988 for delaying lock-up and had six counseling memoranda (the last of which was in 1996 for violating the smoking policy). His counselor gave him a good evaluation and opined he would pose a low degree of threat to the public if released on parole. The psychologist also gave a favorable evaluation, and wrote that Neblett's violence potential was low or less than average, and that his potential to be violent was no greater than for an average person as long as he did not drink alcohol. Resp. Exh. 13. The psychologist downplayed the hallucination that Neblett had reported, seeing it as a perceptual disturbance brought on by the alcohol consumption. Id. at 7-8.

The BPH reviewed Neblett's accomplishments in custody. Neblett had positive work evaluations in the PIA. He also had numerous certificates of completion for electrical work and was working toward becoming an electrician. Neblett had participated in several self-help

programs, including Alcoholics Anonymous, substance abuse recovery, Kairos, Bible studies, Gavel Club, Alternatives to Violence, and Squires programs. He had received his A.A. degree in prison in 1988 and had been working toward his B.A. degree but the prison did not currently have classes that allowed him to obtain that degree. He continued taking classes and studying to stay current, however. He also participated on the prison baseball team since 1997.

The BPH also considered Neblett's parole plans. He had a job offer that was not in the county of commitment. He also had an offer to live with his 76-year old father in his apartment in New York (but Neblett had no job offer there). Neblett had applied to a residential treatment program but had not yet been accepted to it. He planned to continue substance abuse treatment if paroled. Neblett explained that the kind of electrical work he wanted to do was of the sort that did not hire far in advance, and that the employers were more likely to offer work if they knew he actually would be available. See RT 32-33.

The BPH then considered the objections of the local police department where the murder occurred and responses to questions posed by the district attorney of the county in which the murder occurred. Neblett, Neblett's attorney and the district attorney gave final statements before the BPH recessed to deliberate.

The BPH decided that Neblett was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." RT 58. The "paramount" reason for denying parole was the commitment offense. RT 58. The BPH found that the killing was carried out in an especially vicious and brutal manner and was essentially an execution-style murder. RT 58. The murder was done for a trivial motive – as the state court succinctly put it, the victim only had committed the transgression of "mooching" cigarettes and alcohol. Resp. Exh. 26, p. 4. The BPH considered a circumstance and factors proper under California law. A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists included whether "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder,"§ 2402(c)(1)(B), which this one was, and

10

an offense done for a "very trivial" motive, § 2402(c)(1)(D), which this one was. The facts of this murder were far beyond the minimum elements of a second degree murder. See Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th at 682-83. It cannot be said that 18 years into Neblett's 15-to-life sentence, the BPH acted arbitrarily or capriciously or without some evidentiary support, in determining that the execution-style murder of a non-threatening victim showed that Neblett currently presented an unreasonable risk of danger to society if released. See Hayward, 512 F.3d at 545.

Although the murder was paramount, RT 58, the BPH identified other reasons to support the determination that Neblett's release would present an unreasonable risk of danger to society. The BPH relied on his unstable social history, which did have evidentiary support, but was of slight predictive value. The BPH also relied on Neblett's history of prior criminality which, although it consisted of only two minor juvenile offenses related to alcohol consumption, was noteworthy because it was related to his abuse of alcohol and alcohol abuse had played a major role in the commitment offense. RT 9-11, 59. The factor had evidentiary support, but was of somewhat limited predictive value. The BPH determined that Neblett "has programmed for the most part sufficiently; however, it's just not enough at this time." RT 59. The Board found that Neblett still needed therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. The BPH ordered a new psychologist's report to obtain information whether a racial bias still existed and whether the hallucination represented a psychiatric issue that could reappear.[4] RT 61.

The California Court of Appeal upheld the decision in a short but reasoned order. Resp. Exh. 28. The state court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616

---

[4]This was a follow-up to the part of the hearing in which the district attorney had discussed Neblett's claims of a hallucination on the day of the murder. The district attorney's mere opposition to parole generally does not provide a sufficient ground for denying parole, see Hayward, 512 F.3d at 545 n.9, and his comments and questions are noted here only as relevant to the "hallucination" that Neblett claimed to have been acting under on the day of the murder. As the district attorney stated, hallucinations and hearing voices are suggestive of a mental illness that needed to be addressed but had been overlooked in the psychological evaluation.

11

1 (Cal. 2002), which had cited and adopted the <u>Superintendent v. Hill</u> some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. See <u>Rosenkrantz</u>, 29 Cal. 4th at 665-67. Because the California Court of Appeal's decision is the last reasoned decision, that is the decision to which § 2254(d) applies. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005), <u>cert. denied</u>, 547 U.S. 1138 (2006). The California Court of Appeal's rejection of Neblett's due process claim was not contrary to or an unreasonable application of <u>Superintendent v. Hill</u>'s some evidence standard.

B. <u>Breach Of Plea Agreement Claim</u>

Neblett asserts that his plea agreement was breached when the BPH denied parole. He does not identify the alleged breach with any clarity and is unable to point to any particular provision that has been breached. It appears that he is claiming a breach based on the failure of the plea bargain to work out as he subjectively expected it would, i.e., that he would receive a parole date if he fulfilled all the Board's requirements and would be eligible for parole in 10 years. Replacement Memo. of P&As, p. 16, Traverse, p. 19.

The breach of plea agreement claim is time-barred. "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). A habeas petition by a state prisoner challenging a decision of an administrative body, such as the BPH, is covered by the statute and the limitations period starts to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(D); <u>Shelby v. Bartlett</u>, 391 F.3d 1061, 1066 (9th Cir. 2003); <u>see also</u> <u>Redd v. McGrath</u>, 343 F.3d 1077, 1081-82 (9th Cir. 2003). Here, the factual predicate or basis of Neblett's claim that his plea agreement was violated was known to him on January 2, 1994, when his minimum eligible parole date arrived and he was not paroled, or no later than 1995, when he had served ten years in custody and he was not paroled or given a parole date. Neblett's claim accrued in 1994 or no later than 1995 and he did not file this federal habeas petition within

the one-year limitations period, even allowing for the time during 2004 and 2005 that his state habeas petitions were pending. He could not revive the time-barred claim by asserting that the agreement – which by his account was irrevocably breached in 1994 or 1995 – was breached again in 2003, no more than one can revive a time-barred claim on a contract by demanding a new performance and alleging a new breach years after the contract has been irrevocably breached.

Even if the claim was not barred by the statute of limitations, the breach of plea bargain claim has no merit. "Plea agreements are contractual in nature and are measured by contract law standards." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal defendant has a due process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62 (1971), there is no evidence that Neblett's subjective expectations about how parole would be decided were part of the plea agreement. He has not pointed to any language in any plea agreement that shows that any particular term in his plea agreement has been breached. Neblett's sentence upon his conviction based on a plea agreement was 15-to-life and not a straight 15 year sentence. He has received the parole considerations to which he was entitled.

Neblett's assertion of some sort of entitlement to a parole date also appears to rest on the regulation that contains a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. The problem for Neblett is that the relevant statute and regulations require that he first to be found suitable for parole before the matrix is consulted. See Cal. Penal Code § 3041; 15 Cal. Code Regs. § 2402; Dannenberg, 34 Cal. 4th at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). Neblett has not been found suitable, so the time for application of the matrix has not yet arrived.

C.   Vagueness of Regulation

Neblett argues that the parole regulation's phrase "especially heinous, atrocious, or cruel" is unconstitutionally vague. He fails to acknowledge that the language following this phrase

13

provides a list of five factors to consider when determining whether a crime is especially "heinous, atrocious or cruel," including the presence of multiple victims, the abuse or mutilation of the victim and a trivial motive for the crime. See 15 Cal. Code Regs. § 2402(c)(1)(A)-(E). The term "especially heinous, atrocious, or cruel," as further limited by five detailed factors/sub-definitions, is not constitutionally vague. Cf. Arave v. Creech, 507 U.S. 463, 470-78 (1993) (Idaho death penalty statute citing as an aggravating factor crimes carried out in an "utter disregard for human life" was not impermissibly vague because limiting construction had been adopted which defined factor as those crimes demonstrating "the utmost disregard for human life, i.e., the cold-blooded pitiless slayer"). "The Due Process Clause does not require the same precision in the drafting of parole release statutes as is required in the drafting of penal laws." Hess v. Board of Parole and Post-Prison Supervision, 514 F.3d 909, 913-14 (9th Cir. 2008). Not only was the regulation not impermissibly vague on its face, Neblett cannot seriously assert an as-applied challenge because his activity fit squarely within one of the listed factors to be considered in determining whether the offense was committed in an especially heinous, atrocious or cruel manner: "The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." 15 Cal. Code Regs. § 2402(c)(1)(D). Neblett put the rifle to the victim's head and shot him near the ear, which is a classic example of an execution-style killing. The state courts' rejection of Neblett's claim was not an objectively unreasonable application of clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 14, 2008

SUSAN ILLSTON
United States District Judge